IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Wired Fox Technologies, Inc., | ) | Civil Action No.:  6:15-331-BHH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Christopher Estep, individually, and as | ) | |
| Owner of Steel Lions, Inc.; and Steel | ) | |
| Lions, Inc., | ) | |
| | ) | |
| (Of Whom Christopher Estep is also | ) | |
| Defendant-Counterclaimant) | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | **OPINION AND ORDER** |
| | ) | |
| Christopher L. Estep, | ) | |
| | ) | |
| Defendant-Counterclaimant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Jeffrey Yelton, Dwayne Mosley, and | ) | |
| Jon Weatherill, and Asset Enterprises, | ) | |
| Inc., | ) | |
| | ) | |
| Additional Counterclaim Defendants. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant-Counterclaimant Christopher Estep

("Estep") and Defendant Steel Lions, Inc.'s ("Steel Lions") (collectively "Defendants")

motion for summary judgment on Plaintiff-Counterclaim Defendant Wired Fox

Technologies, Inc.'s ("Wired Fox" or "Plaintiff") claims, and Estep's motion for partial

summary judgment on his counterclaims for declaratory judgment under the Copyright

Act and for violation of the South Carolina Payment of Wages Act ("SCPWA") (ECF No.

1

127).[1]

## BACKGROUND AND PROCEDURAL HISTORY

The factual background of this case is set forth thoroughly in the Court's prior orders. (*See* ECF Nos. 70 & 125.) The Court assumes knowledge of that background and incorporates it by specific reference herein. This case arises out of a falling out between various parties to a business venture in Greenville, South Carolina known as Wired Fox Technologies. Counter Defendant Jeffrey Yelton ("Yelton") formed Wired Fox in September 2013 after purchasing the assets of a company called Goddard Technologies ("Goddard"). Goddard was a software company that had a presence in the security and identification software industry for clients such as schools and airports. Estep worked for Goddard as a computer programmer from January 2001 to December 2003, then left to form his own company called Intellisoft, Inc. ("Intellisoft"), which specializes in the same sector of the software industry.

Yelton and Estep began discussing the potential for Estep and/or Intellisoft to perform computer programming work for Wired Fox in October 2013. (Estep Decl., ECF No. 127-3 ¶ 4-5.) Estep confided in Yelton that he was having difficulties with his business partner, David Peeples ("Peeples"), at Intellisoft; indeed, Estep had already begun to have a falling out with Peeples by that fall. (*Id.* ¶¶ 6-9.) On December 9, 2013, after meeting in person, Yelton sent via email to Estep an "Independent Contractor Agreement" setting forth the proposed terms of a business relationship between Wired

---

[1] At the time the motion(s) for summary judgment was filed, Shane Cunningham was named as a defendant, both individually and as owner of Steel Lions. However, all claims against Mr. Cunningham, both in his individual capacity and in his capacity as owner of Steel Lions, have since been dismissed with prejudice pursuant to stipulation by the parties. (*See* ECF No. 132.) Accordingly, the Court will not substantively address any of the pending issues as they might have related to Mr. Cunningham, who is no longer part of this litigation.

Fox and Estep. (*Id.* ¶ 11.) Yelton's email states:

> Attached is a <u>rough</u> agreement that we can operate under. I'm just trying to be very clear about what each of us expects. Please feel free to add anything you want to add. I put the start date at 1-1-2014 but we can start as soon as you are ready.
>
> Give me a call if you want to discuss.

(ECF No. 127-3 at 20 (emphasis in original).) The document was never signed by either party, and Estep contends it was never finalized. Additionally, the document contains certain phrases that seem to indicate it is not a final product and that the particulars of the business relationship will continue to evolve, namely: (1) under one subparagraph of the "payment for services" provision it states, "Let's discuss this"; (2) under the "term/termination" provision it states, "We will start with a 6 month term to see if the relationship is beneficial to both parties"; and (3) under the "expenses covered" provision of the "services to be provided" attachment it states, "How do you think we should handle these?" (*See* ECF No. 71-1 at 2, 5.) Estep states, however, that he and Yelton reached an agreement in principal about most of the material terms of his business relationship with Wired Fox, namely: (1) Estep would perform the service and maintenance work for Wired Fox customers and would receive 50% of the gross revenue from such work or contracts; (2) Estep would create new software[2] for Wired Fox customers which would be owned on a 50/50 basis between himself individually and Wired Fox; and (3) Estep would become an equal 50% owner of Wired Fox at some point prior to the end of 2014. (*Id.*) There is no signed writing that memorializes this limited set of terms.

Yelton describes the December 2013 meeting with Estep to discuss the terms of

---

[2] Estep asserts that the new software originally contemplated between he and Yelton was to be an interface between Winbadge Aviation and CCure 9000, not the Blue Fox Code, which gave rise to the majority of the claims in this litigation.

their emerging business arrangement as follows:

> During the meeting, I made clear that any source code created based upon Goddard Code would belong exclusively to [Wired Fox]. **Any new source code created that was not based on Goddard Code would be owned jointly between [Wired Fox] and Estep.** The new software, which we eventually called the "Blue Fox Code," would be marketed as such on [Wired Fox's] website and in all future marketing materials to [Wired Fox's] customers. These terms were outlined in an Independent Contract Agreement ("Agreement") which was to start on January 1, 2014 and run through December 31, 2014. Under the Agreement, Estep would be a contracted 1099 employee of [Wired Fox]. His agreement to provide services would be for a minimum of six months under the Agreement with both parties being required to perform all requirements no later than December 31, 2014. This Agreement was not signed but we acted in accordance and reliance on the terms beginning January 1, 2014, with Estep being employed as an independent contractor on or about that date.

(Yelton Decl., ECF No. 135-1 ¶ 5 (emphasis added).) Curiously, in the very next sentence of his declaration, when describing the plans for the new Blue Fox Code, Yelton states: "According to the Agreement, the Blue Fox Code was to be **owned** and used **exclusively by [Wired Fox]** in order to provide customizable products and services to third parties, including security and identification software, program development enhancement, scanners, identification card supplies, and various other uses." (*Id.* ¶ 6 (emphasis added).) During the course of this litigation, Plaintiff has represented that the entirety of the terms in the Independent Contractor Agreement were in place and enforceable from January 2014 onward. Paragraph 5 of the Independent Contractor Agreement states:

> **RELATIONSHIP OF PARTIES.** It is understood by the parties that Chris Estep is an independent contractor with respect to Wired Fox Technologies, and not an employee of Wired Fox Technologies. Wired Fox Technologies will not provide fringe benefits, including health insurance benefits, paid vacation, or any other employee benefit, for the benefit of Chris Estep.

4

(ECF No. 71-1 at 2-3.) Paragraph 6 of that document states:

> **WORK PRODUCT OWNERSHIP.** Any copyrightable works, ideas, discoveries, inventions, patents, products, or other information (collectively, the "Work Product") developed in whole or in part by Christ Estep in connection with the development of extensions to Val-Id v3.x and v4.x shall be the exclusive property of Wired Fox Technologies. Upon request, Chris Estep shall sign all documents necessary to confirm or perfect the exclusive ownership of Wired Fox Technologies to the Work Product.
>
> Any development done on products other than Val-Id v3.x and v4.x will be owned jointly and equally (50/50%) by Chris Estep and Wired Fox Technologies.[3]

(*Id.* at 3.)

Estep began performing programming work for Wired Fox in January 2014 as contemplated, with no signed contract in place. Estep's relationship with Peeples declined rapidly over the next few months, and Peeples and Intellisoft began to threaten legal action against Estep, making a variety of allegations about Estep's conduct with respect to source code he developed while at Intellisoft and Intellisoft client accounts. (ECF No. 127-3 ¶¶ 12-14.) After negotiating a stand-still agreement[4] with Intellisoft in order to ensure completion of a software project for the Pentagon, Estep turned back to negotiations with Yelton. (*Id.* ¶¶ 15-20.)

Estep states that he and Yelton finalized their agreement and understanding of the Wired Fox venture in late June 2014, including the following terms: (1) Estep and Yelton would each be 50% shareholders of Wired Fox; (2) Estep would be provided a draw from Wired Fox in the amount of at least $8,000 per month, plus employment benefits including medical, dental, and life insurance coverage, and retirement benefits

---

[3] The Blue Fox Code is an independent software product and is not an extension of Val-Id v3.x and v4.x.
[4] In this stand-still agreement, Peeples and Estep agreed, *inter alia*, to temporarily set aside their disagreements and focus on completing the Pentagon project.

through a 401(k); (3) the ownership of any software created by Estep, including the Blue Fox Code he had already been developing for 6-8 weeks, would be split between Estep and Wired Fox on a 50/50 basis; (4) Yelton would provide all of the working capital to cover the start-up expenses of the company, including computer hardware, equipment and software, marketing, travel, and related business expenses; and (5) Yelton would reimburse Estep for all legal expenses associated with the on-going dispute with Intellisoft and Peeples, which was anticipated to possibly include the purchase of Peeples' ownership interest in Intellisoft by Wired Fox. (*Id.* ¶ 20.)

On July 21, 2014, Estep and Peeples participated in a mediation regarding the proposed split-up of Intellisoft, during which Estep pursued various options to purchase Peeple's half of Intellisoft, on the promise of Yelton funding such a purchase if it came about. (*Id.* ¶¶ 21-23.) Also on July 21, 2014, Yelton entered into an Administrative Shared Services Agreement with two of his business associates, Dwayne Mosley ("Mosley") and Jon Weatherill ("Weatherill"), through their company Asset Enterprises, Inc. ("AEI"), whom Yelton had contacted regarding a possible acquisition of Wired Fox due an inability to sustain mounting operating costs. (ECF No. 135-1 ¶ 13.) Yelton next met with Mosley and Weatherill on July 29, 2014, in order to detail a rough plan for a possible joint venture between AEI and Wired Fox. (*Id.* ¶ 13 & pg. 26.) Yelton contends that he informed Estep of the specifics of this meeting during several telephone conversations. (*Id.* ¶ 13.)

On July 31, 2014, Yelton sent Estep an email with subject line, "Our Way Forward," detailing his thoughts "about how to make this Intellisoft/Wired Fox

Technologies deal work." (ECF No. 127-3 at 26.) Yelton indicates that he anticipates a cash outlay of between $150,000 and $350,000 over a minimum of 12 months before the venture becomes profitable. He further states, that at a minimum "we need to fund your [Estep's] salary + benefits," and indicated that such compensation would include, for "all Wired Fox employees, medical, dental and life coverage and the ability to participate in a 401K plan." (*Id.*) Yelton told Estep that he was taking a job with a company called Ingram Micro in order to ensure that there would be enough capital to sustain the Wired Fox venture, and that Mosley and Weatherill would be stepping into his role at Wired Fox. Yelton wrote that "[Mosley] will run the company day-to-day while I support him on a weekly basis." (*Id.*) Yelton further stated, "I will leave 100% of my money in the company and will add additional if needed," that "[t]he [Wired Fox] entity will remain the same," that "I [Yelton] will need to be an investor in the company so that I don't have a conflict of interest with Ingram [Micro] so [Mosley], [Weatherill] and Chris Garrison will have to be the main partners with you," and that "**The structure of the deal will remain the same** with [Mosley], [Weatherill] and Chris [Garrison] added as shareholders." (*Id.* (emphasis added).) Estep contends that the phrase, "the deal," as used in Yelton's July 31, 2014 email refers to Estep's and Yelton's oral agreement from late June 2014, *not* the proposed Independent Contract Agreement from January 1, 2014. (*See* ECF No. 127-1 at 10.) Estep further asserts that Yelton viewed him as a 50% "partner" in Wired Fox at this point, and that Yelton was merely bringing Mosley and Weatherill in to take Yelton's place in the venture. (*Id.*) Yelton contends that his agreement with Estep was that Estep would become a "joint (50%) owner" of Wired Fox "if all terms of the [Independent

Contractor Agreement] were satisfied by December 31, 2014." (ECF No. 135-1 at 4; *see* ECF No. 71-1 ¶ 11 ("It is the intent of both parties to be joint owners in Wired Fox Technologies on or before December 31, 2014.").)

Estep continued to perform his programming duties as before, while Mosley and Weatherill assumed the day-to-day operations of Wired Fox and Yelton went to work for Ingram Micro. (ECF No. 135-1 ¶ 15.) During this period, Mosley and Weatherill were providing the funds necessary to keep Wired Fox operational and were making efforts to reach a final joint venture agreement between the parties. (*Id.*)

On August 7, 2014, Intellisoft filed a lawsuit against Estep in this Court, which matter was detailed to the undersigned. Estep informed Yelton and Mosley about the Intellisoft lawsuit and received money from Yelton to pay for at least a portion of his legal fees in defending that suit. Estep contends that Yelton and Mosley promised they would pay all of his legal expenses in connection with defending the lawsuit and in pursuing counterclaims against Intellisoft and Peeples. (ECF No. 127-3 ¶¶ 25-26.) Yelton contends that he loaned money to Estep to pay his attorney's initial retainer, and that any other monies provided to Estep were for the purpose of general living expenses. (ECF No. 135-1 ¶ 17.)

Estep asserts that in late-August or early-September 2014, Mosley unilaterally informed him that Mosley and Weatherill had decided they were not willing to be equal, 50% shareholders with him in Wired Fox, and that they insisted on together owning at least a 51% controlling interest of the outstanding shares of the company. (ECF No. 127-3 ¶ 28.) Estep further contends that he immediately contacted Yelton about the new

8

partners' effort to change the deal he and Yelton had previously agreed to, but Yelton convinced him that it would be in his interest to give up some ownership interest in Wired Fox to Mosley and Weatherill in exchange for receiving additional cash up front. (*Id.* ¶ 29.) Estep also claims that Yelton told him it was fair to give up some ownership interest in Wired Fox because Estep was the only shareholder who would also be receiving a salary from Wired Fox as a W-2 employee, and Mosley and Weatherill were taking more financial risk by investing in the company. (*Id.*)

On September 5, 2014 Intellisoft, Peeples, and Estep participated in a mediation of the Intellisoft lawsuit, which Estep settled for $200,000 in exchange for transferring his half of Intellisoft to Peeples, with no non-compete agreement included. (*Id.* ¶ 30.) Estep contends that he forwent an opportunity to settle the case for the greater sum of $325,000, but including a six-month non-compete, specifically based on his discussions with Yelton about their commitment to the Wired Fox venture, in effect making a $125,000 investment in Wired Fox, to ensure that he would be able to continue his work with Wired Fox unhindered by any restrictions on his ability to compete with Intellisoft. (ECF No. 127-3 ¶¶ 30-31.) All parties to the Intellisoft lawsuit signed a settlement memorandum at the conclusion of the mediation session on September 5, 2014, which contained mutual releases specifically including a release of Wired Fox from any potential liability to Intellisoft or Peeples. (*Id.* ¶ 32.)

Prior to the Intellisoft mediation, and without any notice to Wired Fox, Yelton, Mosley, or Weatherill, Estep applied for and was granted a copyright of the Blue Fox Code on September 3, 2014. (*Id.* ¶ 20.) On September 10, 2014, Estep met with Yelton,

9

Mosley, and Weatherill to proceed with further negotiations regarding the terms of a proposed joint venture. (*Id.* ¶ 21.) Describing that meeting, Yelton states:

> Estep disclosed that he had applied for the copyright of the Blue Fox Code in his own name. This fact came as a surprise to all parties because up to this point all parties were acting under the assumption that [Wired Fox] owned the Blue Fox Code or that Estep and Plaintiff owned the code 50/50. I later heard Estep acknowledge for the first time in his deposition that he [Estep] had copyrighted the Blue Fox Code in his name as leverage in both the Intellisoft mediation and the Joint Venture negotiations.
>
> Despite Estep's copyrighting the Blue Fox Code in violation of the terms of the Agreement, Mosley, Weatherill, and I, still proceeded in good faith with negotiations regarding the terms of a proposed Joint Venture with him. The various structures for the Joint Venture proposed at the September 10, 2014 meeting took into account Estep's actual ownership of the Blue Fox Code and his anticipated assignment of the Blue Fox Code to the new company as a term of a final agreement culminating in the Joint Venture's new company. The parties agreed that the new company would be structured as a 70/30 ownership split with Mosley and Weatherill receiving seventy percent (70%) of the ownership and Estep receiving thirty percent (30%) of the ownership. In consideration for Estep receiving eight thousand dollars ($8,000.00) per month salary, a final eight thousand dollars ($8,000.00) cash toward his legal expenses, and eighty thousand dollars ($80,000) cash, his 50% ownership in the proposed Joint Venture would be reduced to 30%. He would also be required to assign the Blue Fox Code to the new company in lieu of any capital contribution by him. The other owners would receive no salary from the new company, would provide all funding for its daily operations and would be responsible for additional capital as needed for expansion and development in the growth of the new company as its investment in the Joint Venture. As additional investment in the Joint Venture, they would also be required to pay Estep's cash payments per the terms of the proposed Joint Venture. All terms went into effect upon execution of the final agreement. [Wired Fox's counsel] was made aware of these terms for purposes of drafting the corporate documents and necessary agreements for review by [Estep's counsel].

(*Id.* ¶¶ 21-22.) The substance of the September 10, 2014 meeting is illustrated, at least in part, in a white-board photograph attached as Exhibit F to the amended complaint. (ECF No. 71-6 at 4.) The white-board diagram reflects that the parties specifically

contemplated the creation of several documents to memorialize the terms of the revised deal: (1) a Buy/Sell agreement, including "Pain to Leave"; (2) non-compete and non-disclosure agreements; (3) a copyright agreement; and (4) an operating agreement and/or employee manual. (*Id.*)

The proposed joint venture never came to fruition. Estep asserts that his persistent attempts to review and consummate the closing documents were repeatedly put off by Mosley and Wired Fox's counsel, until he was finally informed by Yelton on December 1, 2014, that Mosley and Weatherill had decided not to move forward with the Wired Fox venture after all. (*Id.* ¶¶ 36-48.) Yelton then indicated that he was unable to proceed with the venture because of his position at Ingram Micro and proposed that Estep purchase his interest in Wired Fox for $40,000 payable over a two-year period, which proposal Estep ultimately rejected. (*Id.* ¶ 48.) Yelton, on the other hand, asserts that the joint venture was never consummated because of Estep's unpredictable and troubling behavior. In his declaration, Yelton describes the demise of the negotiations as follows:

> Given that the parties had learned of Estep's filing of the copyright for the Blue Fox Code while in ongoing negotiations with Intellisoft without disclosing the same, it was agreed that the Settlement Agreement between Intellisoft and Estep should be adopted as a Final Order in full resolution of the Intellisoft matter prior to moving forward with the proposed Joint Venture. While the parties awaited the Final Order regarding the Settlement agreement in the Intellisoft case, Estep and [Wired Fox] continued to operate pursuant to the terms of the Agreement, the only exception being that Estep now had full ownership of the Blue Fox Code pursuant to his copyright application. The final Order in the Intellisoft case was issued on October 27, 2014. Between then and mid-November, Estep became frustrated that final documents were not ready for execution. Despite being assured that all the parties were waiting on was final documents from [Wired Fox's counsel] and that such documents take time, especially given that the underlying matter had only just been resolved a

11

couple of weeks prior, Estep sent an email to Mosley and Yelton (but specifically addressed to [Yelton]), prior to a trade show he was set to attend on behalf of [Wired Fox] in Orlando, Florida. (Exhibit "H-1"). In the email, Estep stated in reference to his attendance at the event, "[i]f you keep going the way you are going the trip to Orlando will not be a chance to show off our new software, it will be a networking opportunity where the core of your business will find other employment." *Id.* I interpreted this correspondence to be a threat by Estep whereby he, along with other unnamed Wired Fox employees, would use the trip to Orlando – funded by Wired Fox – as an opportunity to seek alternative employment opportunities, taking with them the newly created Blue Fox Code. This threatening behavior, in such close proximity to the timing of the revelation of his sole ownership in the Blue Fox Code, along with other instances of Estep's unprofessional and unpredictable actions ultimately led to the disintegration of the Joint Venture.

(*Id.* ¶ 23.)

After returning all Wired Fox equipment in his possession to Yelton through their respective attorneys, Estep created Steel Lions through Legal Zoom in mid-December 2014. (*Id.* 49-50.) Shortly after the new business entity was officially incorporated with the State of South Carolina in January 2015, Wired Fox filed the instant lawsuit against Estep and Cunningham, whom Estep had recruited to join him at Steel Lions. (*Id.* ¶ 56.) Estep and Cunningham soon decided that continuing with Steel Lions was not feasible because Yelton and Wired Fox had filed UCC-1 financing statements claiming a security interest in the software, making it impossible to sell. (*Id.*)

Wired Fox initially alleged that Estep was an "employee"[5] of Wired Fox who created new source code for the company, namely, the Blue Fox Code. Wired Fox further alleged that Estep improperly copyrighted the Blue Fox software in his own name,

---

[5] Wired Fox's initial complaint, removed to this Court from the Greenville County Court of Common Pleas, uses the terms "employment agreement," "employment," and "employed" throughout to describe Estep's relationship to the company. (*See* ECF No. 1-1 at 6-12.) Yelton's affidavit in support of Wired Fox's motion for temporary restraining order in state court further described Estep as a "contract employee," Estep's tenure with Wired Fox as his "employment," and the relevant document as an "employment contract." (*See* ECF No. 1-2 at 8-9.)

and then left Wired Fox, with Cunningham, to form a competitor, Steel Lions. According to these initial allegations, Estep and Steel Lions were improperly using Wired Fox's exclusive intellectual property, including the Blue Fox Code, to harm Wired Fox's business relationships.

In its September 21, 2015 order, the Court granted Wired Fox leave to amend its complaint, but ruled that any claims based on Wired Fox's purported ownership of the copyright to the Blue Fox Code were precluded by the United States Copyright Act, 17 U.S.C. § 301(a), because Wired Fox had not complied with the necessary prerequisite of registering the copyright. (*See* ECF No. 70 at 12-13); *see also* 17 U.S.C. § 411(a) ("no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title"); *Miller v. CP Chemicals, Inc.*, 808 F. Supp. 1238, 1242 (D.S.C. 1992) (dismissing copyright infringement claim because lack of registration is fatal to such a claim and mandates dismissal).

Wired Fox filed its amended complaint (ECF No. 71) on September 30, 2015, proceeding with the causes of action that the Court ruled were not preempted by the Copyright Act: (1) conspiracy; (2) intentional interference with business relationships; (3) tortious interference with contractual relationships (against Shane Cunningham only, *see id.* ¶¶ 61-66); (4) breach of fiduciary duty; (5) breach of contract; and (6) unjust enrichment. The amended complaint no longer refers to Estep's relationship with Wired Fox as "employment," or as pursuant to an "employment contract." Rather, Wired Fox alleges that Estep was an "independent contractor," in accordance with the title and

13

terms of the proposed Independent Contractor Agreement. (*See* Ex. A, Am. Compl., ECF No. 71-1 at 2.)

Estep filed an answer to the amended complaint on October 19, 2015, and included his amended counterclaims against Wired Fox and additional Counterclaim Defendants Yelton, Mosley, Weatherill, and AEI. (ECF No. 81.) Estep's counterclaims include causes of action for: (1) declaratory judgment—copyright; (2) breach of contract; (3) breach of contract accompanied by a fraudulent act; (4) breach of fiduciary duty; (5) promissory estoppel; (6) violation of the SCPWA; (7) judicial dissolution of corporation (against Wired Fox and Yelton only); (8) slander per se (against Wired Fox, Yelton, Mosley, and Weatherill only); (9) slander of title (against Yelton, Mosley, and Weatherill only); (10) product disparagement (against Wired Fox, Yelton, Mosley, and Weatherill only); and (11) breach of contract as intended third-party beneficiary (against AEI only).

Counterclaim Defendant AEI filed counterclaims against Estep on November 9, 2015 (ECF No. 104), which were either withdrawn or subsequently dismissed by the Court for failure to state a claim upon which relief could be granted in its August 4, 2016 order (ECF No. 125 at 11-14).

Defendants filed the instant motion(s) for summary judgment on August 8, 2016 (ECF No. 127) and additional attachments in support by way of separate docket entries (ECF Nos. 128 & 129). Plaintiff and all Counterclaim Defendants responded on September 26, 2016. (ECF No. 135.) Defendants replied on October 6, 2016. (ECF No. 136.) The matter is ripe for review, and the Court now issues the following ruling.

14

## LEGAL STANDARD

### Summary Judgment

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the Court must construe all inferences and

15

ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a summary judgment motion. *Anderson*, 477 U.S. at 252. "Genuineness" of the disputed issue(s) "means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1996). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

**Copyright Act Preemption**

The Court discussed the issue of Plaintiff's state law claims being subject to preemption by the Copyright Act in its September 21, 2015 order, and incorporates that discussion and associated rulings herein. (*See* ECF No. 70 at 7-15.) Nevertheless, it is appropriate to provide a basic framework for the preemption analysis here, as the issue has resurfaced with respect to remaining claims in Plaintiffs amended complaint.

Section 301(a) of the Copyright Act provides, in part, that "[a]ll legal or equitable

rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title." 17 U.S.C. § 301(a). Section 106 of the Copyright Act gives the owner of a copyright "the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work . . . ; (2) to prepare derivative works based on the copyrighted work; (3) and to distribute copies . . . of the copyrighted work to the public, by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106. The reach of Section 301(a) of the Copyright Act has been described as embodying a "broad preemptive scope." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 658 (4th Cir. 1993).

State law claims are completely preempted by the Copyright Act where: (1) "the claim 'falls within the subject matter of copyright'" and (2) "the claim 'protects rights that are equivalent to any of the exclusive rights of a federal copyright.'" *Tire Eng'g & Dist., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 309 (4th Cir. 2012) (quoting *Carson v. Dynergy, Inc.*, 344 F.3d 446, 456 (5th Cir. 2003)). In *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 229 (4th Cir. 1993), the Fourth Circuit applied the well-established "extra element" test to determine whether a state-law claim falls within the preemptive reach of Section 301(a). Under the "extra element test," a state-law claim is not preempted if (1) the claim requires an "extra element" beyond the act of reproduction, performance, distribution, or display of the copyrighted work, and (2) the "'extra element' changes the 'nature of the action so that it is *qualitatively* different from a copyright

infringement claim.'" *Id.* at 230 (quoting *Computer Assocs., Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)) (emphasis in original).

## DISCUSSION

### I. Estep's and Steel Lions' Motion for Summary Judgment on Wired Fox's Claims

#### A. Tortious Interference with Contractual Relations and Conspiracy

After Defendants filed the motion for summary judgment, and before Plaintiff filed its response, Plaintiff released Shane Cunningham ("Cunningham") from this case and consented to a stipulation of dismissal with prejudice as to all claims against him, both in his individual capacity and in his capacity as owner of Steel Lions. (ECF No. 132.) Plaintiff's tortious interference with contractual relations claim was against Cunningham only and was, therefore, dismissed by stipulation. (*See* ECF No. 135 at 2.) Plaintiff's conspiracy claim was asserted against Estep and Cunningham, and Plaintiff has now indicated its willingness to voluntarily dismiss the claim as against Estep because Cunningham was a necessary party to establish such a claim. (*See id.*) Accordingly, the Court hereby dismisses with prejudice the tortious interference with contractual relations claim (Count III) and the conspiracy claim (Count I). The portions of Defendants' motion for summary judgment that address these claims are now moot.

#### B. Intentional Interference with Business Relationships

"To state a claim for intentional interference with a contract, a plaintiff must prove: '(1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom.'" *Waldrep Bros. Beauty Supply v. Wynn Beauty Supply Co.*, 992 F.2d 59, 62 (4th Cir.

1993) (quoting *DeBerry v. McCain*, 274 S.E.2d 293, 296 (S.C. 1981)). Defendants argue that no genuine issue of material fact remains on this claim because Plaintiff has not produced any evidence that Wired Fox breached a contract with any of its customers as a result of Defendants' actions.

First, Defendants note that Yelton testified in his deposition that he was not aware of any contract that Wired Fox had breached with any of its customers, nor had any Wired Fox customer made an accusation that Wired Fox breached a contract. (Yelton Dep., ECF No. 127-6 at 8-9.) Yelton also testified that after Mosley resigned from Wired Fox in mid-December 2014, the company did not hire a computer programmer to perform maintenance contracts. (*Id.* at 7-8.) Second, Defendants explain that in response to certain interrogatories propounded by Estep to Plaintiff asking the identity of all customers with which Wired Fox had continuing software maintenance or support contracts involving either the Goddard Code or the Blue Fox Code, and the identity of any and all contracts or customers that any Defendant allegedly interfered with, Plaintiff responded by identifying three customers: Greenville Technical College, Brashier Middle College Charter High School, and Jacksonville Airport. (*See* ECF No. 128-3 at 20.) However, Defendants argue, neither Plaintiff, nor any of those three customers breached their respective contracts. Yelton testified that Jacksonville Airport decided not to renew its contract with Wired Fox in 2015. (ECF No. 127-6 at 8.) Greenville Technical College did not renew its maintenance contract for the Blue Fox Code in 2015 because Plaintiff sold the school a new software program called "Datacard ID Works." (*See* Correspondence & Wired Fox Invoice, ECF No. 128-4.) Similarly, Wired Fox moved

19

Brashier Middle College Charter High School to a "Datacard" software product and maintenance agreement. (*See* Correspondence, ECF No. 128-5.) In summary, Defendants assert, the absence of any underlying breach of contract by either Plaintiff or by any of its customers is fatal to the tortious interference claim. (*See* ECF No. 127-1 at 22); *First Union Mortg. Corp. v. Thomas*, 451 S.E.2d 907, 913 (S.C. Ct. App. 1994) (outlining the elements of a cause of action for intentional interference with contractual relations and stating, "[W]ithout a breach of the underlying contract, there can be no recovery").

Plaintiff responds that it has demonstrated a material issue of fact with regard to Estep's conduct, on behalf of Wired Fox, toward Greenville Technical College and Brashier Middle College Charter High School. Without any citations to the record, Plaintiff simply asserts that prior to Estep's resignation, and while still providing support to Wired Fox customers, "Estep unilaterally installed the Blue Fox Code in Brashier Middle and Greenville Tech. Estep did this without justification while both customers had existing prepaid software support and maintenance contracts using the Goddard Code." (ECF No. 135 at 21.) Plaintiff further argues that both customers subsequently suffered software failures, that Estep was the only party capable of providing software support because he had the only copy of the Blue Fox Code, and that Wired Fox suffered lost revenues because it had to sell these two customers third-party software. (*Id.*)

Plaintiff's half-hearted attempts at staving off summary judgment on this claim are unavailing. Lost revenues to do not equate to breach of contract. Wired Fox's former president (Yelton), who was intimately involved in the conception of and negotiation

20

surrounding the Wired Fox venture from beginning to end, himself testified that there was no breach on the part of either Wired Fox or its customers. There is zero evidence of any such breach. The Court need say no more. Plaintiff has not demonstrated that there is a triable issue on this claim, and Defendants' motion for summary judgment is granted in this respect.

### C. Breach of Fiduciary Duty

In order to succeed on the breach of fiduciary duty claim, Plaintiff must show the existence of a fiduciary duty owed by Estep to Wired Fox, a breach of that duty, and damages proximately resulting from the breach. *See RFT Mgmt. Co., LLC v. Tinsley & Adams, LLP*, 732 S.E.2d 166, 173 (S.C. 2012). "A confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience is bound to act in good faith and with due regard to the interests of the one imposing the confidence." *Davis v. Greenwood Sch. Dist. 50*, 620 S.E.2d 65, 68 (S.C. 2005) (citing *Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 716 (S.C. 2003)). "'Courts of equity have carefully refrained from defining the particular instances of fiduciary relationship in such a manner that other and perhaps new cases might be excluded and have refused to set any bounds to the circumstances out of which a fiduciary relationship may spring.'" *Armstrong v. Collins*, 621 S.E.2d 368, 376 (S.C. Ct. App. 2005) (quoting *Island Car Wash, Inc. v. Norris*, 358 S.E.2d 150, 152 (S.C. Ct. App. 1987)). The determination regarding the equitable issue of whether a fiduciary relationship exists is to be made by the Court. *Cowburn v. Leventis*, 619 S.E.2d 437, 451 (S.C. Ct. App. 2005) (citing *Hendricks*, 578 S.E.2d at 715).

The imposition of a fiduciary duty upon a party constitutes a high standard of responsibility and should not been done lightly. *See Fisher v. Shipyard Vill. Council of Co-Owners, Inc.*, 760 S.E.2d 121, 128 n.2 (S.C. Ct. App. 2014), *reh'g denied* (Oct. 27, 2014), *cert. granted* (Mar. 19, 2015), *aff'd as modified*, 781 S.E.2d 903 (S.C. 2016) (quoting *O'Shea v. Lesser*, 416 S.E.2d 629, 632 (S.C. 1992)). A fiduciary duty generally cannot be unilaterally imposed by one party; rather, "The evidence must show the entrusted party actually accepted or induced the confidence placed in him." *Ellis v. Davidson*, 595 S.E.2d 817, 822 (S.C. Ct. App. 2004) (citing *Regions Bank v. Schmauch*, 582 S.E.2d 432, 444 (S.C. Ct. App. 2003). Moreover, a mere employer-employee relationship is not sufficient to create a fiduciary duty under South Carolina law. *See In re Hunnicut*, 466 B.R. 797, 801 (Bankr. D.S.C. 2011) ("No trust exists in a simple employer/employee relationship. Such a relationship is merely comprised of an agreement for the employee to perform work and the employer to compensate him for the work he performs."). As the Supreme Court of South Carolina has explained:

> The term fiduciary implies that one party is in a superior position to the other and that such a position enables him to exercise influence over one who reposes special trust and confidence in him. As a general rule, mere respect for another's judgment or trust in his character is usually not sufficient to establish such a relationship. The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party.

*Burwell v. S.C. Nat. Bank*, 340 S.E.2d 786, 790 (S.C. 1986) (internal citations omitted) (finding no fiduciary relationship between guarantor of loan and bank that loaned funds to airline corporation, no evidence that bank representative was aware of any special trust reposed in him, and no reasonable basis for guarantor to believe that bank

representative was acting on guarantor's behalf rather than on behalf of the bank). In *Steele v. Victory Sav. Bank*, the Court of Appeals of South Carolina provided a helpful list of scenarios in which a fiduciary relationship has been found:

> By way of illustration, the appellate courts of this state have found fiduciary relationships to exist in the following cases: *Loftis v. Eck*, 341 S.E.2d 641 (S.C. Ct. App. 1986) (agent holding power of attorney in fiduciary relationship with his principal); *Lengel v. Tom Jenkins Realty, Inc.*, 334 S.E.2d 834 (S.C. Ct. App. 1985) (broker was a fiduciary of his client); *Matter of Moore*, 312 S.E.2d 1 (S.C. 1984) (attorney in fiduciary relationship with his client); *Landvest Assoc. v. Owens*, 274 S.E.2d 433 (S.C. 1981) (partners were fiduciaries to each other); *Duncan v. Brookview House, Inc.*, 205 S.E.2d 707 (S.C. 1974) (promoters of a corporation are fiduciaries to each other and to corporation); *Talbot v. James*, 190 S.E.2d 759 (S.C. 1972) (officers and directors of a corporation stand in fiduciary relationship to shareholders); *cf. Rush v. South Carolina National Bank*, 343 S.E.2d 667 (S.C. Ct. App. 1986) (bank and depositor may stand in a fiduciary relationship where bank undertakes to advise depositor as part of services bank offers). On the other hand, no fiduciary relationship between a bank and its depositor has been found where the bank officer was unaware of any special trust reposed in him. *Burwell v. South Carolina National Bank*, 340 S.E.2d 786 (S.C. 1986).

368 S.E.2d 91, 93 (S.C. Ct. App. 1988). None of the examples listed in *Steele* are analogous to the instant facts, and they are not persuasive to finding a fiduciary relationship under the circumstances present here. Therefore, as more fully explained below, the Court finds that no fiduciary relationship existed between Estep and Wired Fox and that Plaintiff's breach of fiduciary duty claim fails as a matter of law.

In the breach of fiduciary duty claim, Plaintiff alleged that Estep's fiduciary duty to Wired Fox arose from the Independent Contractor Agreement. (ECF No. 71 at ¶ 68.) Putting aside for a moment the undisputed fact that the Independent Contractor Agreement was never signed by either party, Defendants convincingly argue that if a traditional employer/employee relationship alone is not sufficient to give rise to a

fiduciary duty, an independent contractor relationship can hardly be sufficient in that score. (*See* ECF No. 127-1 at 27.) Defendants further assert that Plaintiff's allegations with regard to putative breach—namely, "Upon information and belief, [Estep] met with and discussed [his] work with Plaintiff's existing customers while still operating as [an] independent contractor[] for Plaintiff, disclosing confidential and secret business information to Plaintiff's customers in beach of [his] duties." (*see* ECF No. 71 ¶ 70)—are conclusory in nature, and insufficient to survive summary judgment. (*See* ECF No. 127-1 at 28.)

Plaintiff responds by arguing that the case of *Island Car Wash, Inc. v. Norris*, 358 S.E.2d 150 (S.C. Ct. App. 1987), exhibits facts closely analogous to the instant case and provides for the existence of a fiduciary relationship outside the context of circumstances where such a relationship has typically been recognized. (ECF No. 135 at 18.) In *Island Car Wash*, the Court of Appeals of South Carolina held that the former manager of a car wash, who was married to the daughter of the majority shareholders in the car wash corporation, owed a fiduciary duty to the corporation for the following reasons:

> [T]he evidence is clear that the owners of I.C.W., mainly Mrs. Norris's father and mother and Mrs. Norris, at the time the wife of Mr. Norris, reposed special faith and confidence in Norris in the starting up of the car wash business. He was the general manager of the car wash corporation and was responsible for getting together whatever was necessary to establish the car wash operation; he handled all negotiations with [the supplier with whom he conspired to convert money belonging to I.C.W.]. We hold that Norris occupied a fiduciary relationship to I.C.W. and was the dominant party in the spending of the money of I.C.W. in the starting up of the business.

*Id.* at 152. Plaintiff contends that the facts of the instant case "closely mirror" the facts at issue in *Island Car Wash* because: (1) Wired Fox reposed special faith and confidence in

Estep; (2) Wired Fox entrusted Estep to act as the sole software developer and maintenance provider as it moved to expand its presence in the software security industry; and (3) Wired Fox's success depended heavily on Estep's ability to improve upon the existing Goddard code and his ability to create new iterations thereof. (ECF No. 135 at 19.)

The Court finds Plaintiff's arguments unpersuasive, and further finds that Defendants are entitled to summary judgment on the breach of fiduciary duty claim. For one thing, Plaintiff cannot have it both ways: Estep cannot be both an independent contractor *merely working toward* an ownership interest in Wired Fox (as contemplated in Attachment A and paragraphs 3, 5, 6, and 11 of the Independent Contractor Agreement that Plaintiff avers was operative, *see* ECF No. 71-1 at 2-3, 5), *and* the all-encompassing lynchpin of Wired Fox's business with complete control over its assets and full mastery over its fate (as Plaintiff argues in its response brief, *see* ECF No. 135 at 19-20, and Yelton represents in his declaration, *see* ECF No. 135-1 ¶ 30 ("Estep has single-handedly brought an end to Wired Fox's presence in the security software industry."). For another, the facts of this case are distinguishable from those at issue in *Island Car Wash*. In *Island Car Wash*, the gravamen of the general manager's duty to the corporation was to source and purchase all equipment and supplies necessary to start the business, which purchases, through a co-conspirator supplier, were the substance of the manager's defalcations. *See* 358 S.E.2d at 152. Here, Estep was not the general manager of Wired Fox, and was an *indirect* investor only—through the code he developed in furtherance of realizing the venture he and Yelton had envisioned. To

the extent Yelton or any of the other Counterclaim Defendants reposed special faith and confidence in Estep, such trust was unilaterally imposed and did not give rise to a fiduciary relationship. Indeed, due in large part to the absence of any executed contracts or signed writings in this case, it is hard for the Court to tell when brainstorming and negotiating a new software venture ended and settled business operations began, if ever. To impose a fiduciary duty upon an individual not yet party to the corporation in question, but in the midst of negotiations and efforts to become so, is dangerous territory and the Court declines such an imposition. Accordingly, the Court finds that no fiduciary relationship existed and grants summary judgment on this claim.

### D. Breach of Contract

In Count V of the amended complaint, Plaintiff alleges that Estep "breached his obligations under the Agreement initially when he misrepresented his ability to provide the services Plaintiff engaged him to perform by not fully disclosing his ongoing dispute with Intellisoft." (ECF No. 71 ¶ 76.) Moreover, Plaintiff avers, "Estep further breached the Agreement when he applied for and copyrighted the software developed under the Agreement in direct violation of the terms of the Agreement." (*Id.* ¶ 77.) Finally, Plaintiff alleges, "[Estep's] actions in copyrighting the Blue Fox Code, disallowing Plaintiff access to the Blue Fox Code, forming Defendant Steel Lions, Inc. with Defendant Cunningham, and using the Blue Fox Code to lure away Plaintiff's existing customers are all direct breaches of the Agreement." (*Id.* ¶ 79.)

As an initial matter, the Court has already ruled that a portion of Plaintiff's breach of contract claim is preempted by the Copyright Act. In its September 21, 2015 order, the

Court allowed the breach of contract claim to persist because it was based in part on alleged misrepresentations concerning Estep's prior relationship with Intellisoft and/or the misappropriation of Wired Fox's clients based on Estep's access to and knowledge of the same, through his work with Wired Fox. The Court stated:

> The defendants' relationship to Blue Fox Code is not predicate, therefore, to these claims. They may be amended and/or added as not futile for any preemption by the Copyright Act. To the extent any of these causes of action are also additionally based on allegations of misappropriation of Blue Fox, those allegations are preempted as simply alleging misappropriation of the copyright. . . . The Court is not, however, worried about the presence of preempted averments contained in the above causes of the amended complaint, as proposed. Such averments are simply not actionable, as a matter of law.

(ECF No. 70 at 11.) With no desire to be glib, the Court would note that its statements in this regard seem clear enough. What remains of the breach of contract claim, then, are the allegations that Estep: (1) misrepresented his ability to provide the services Wired Fox engaged him to perform by not fully disclosing his ongoing dispute with Intellisoft, and (2) formed Steel Lions to lure away Wired Fox's existing customers. (*See* ECF No. 71 ¶¶ 76, 80.)

With respect to the first of these allegations, the Court finds that the record contradicts Plaintiff's claim. It is undisputed that Estep settled his dispute with Intellisoft through mediation, specifically avoiding the inclusion of a non-compete provision and sacrificing an additional $125,000 in settlement compensation in order to avoid its inclusion. (ECF No. 127-3 ¶¶ 30-31.) The September 5, 2014 settlement memorandum contained mutual releases specifically including a release of Wired Fox from any potential liability to Intellisoft or Peeples. (*Id.* ¶ 32.) It is unclear, what specific information

about the Intellisoft dispute Estep is supposed to have withheld from Yelton and Wired Fox. Indeed, in his May 8, 2015 sworn declaration, filed in this Court, Yelton stated as follows:

> 11. In August of 2014, Intellisoft, through its co-owner David Peeples, filed suit against Estep while he was working for Wired Fox. Intellisoft's lawsuit alleged various claims including copyright infringement of certain computer software.
>
> 12. Estep hired [Estep's counsel] to represent him in the suit with Intellisoft. It was at this time that Estep contacted me and requested that I reimburse him for all legal fees associated with the lawsuit.
>
> 13. Even though I had no duty to pay such expenses, I, as President of Wired Fox, shared a common interest in the successful defense of the Intellisoft suit. The lawsuit between Estep and Intellisoft focused on determining who properly owned computer software. It was imperative that Estep be deemed the rightful owner of the computer software to ensure that his work for Wired Fox would not be subject to any potential claims.
>
> 14. [Estep's counsel] assured me throughout the course of Estep's litigation with Intellisoft that Estep was the rightful owner of the software and that Wired Fox was at no risk of being exposed to a lawsuit due to Estep's association with the corporation.
>
> 15. Because I was reimbursing Estep for his defense, and because of my shared interest in the outcome of the case against Estep, *I was made privy to nearly all communications between [Estep's counsel] and Estep.*

(ECF No. 56-5 ¶¶ 11-15 (emphasis added).)

In its response brief, Plaintiff seeks to salvage the breach of contract claim by diverting attention away from the substance of the actual allegations in the amended complaint, and asserting that during the interim between Yelton's May 2015 declaration and the summary judgment briefing, Plaintiff "learned many facts that would allow the Court and a jury to conclude defendant Estep misrepresented his ability to provide the services Plaintiff engaged him to perform." (ECF No. 135 at 13.) In a footnote

28

accompanying this argument, Plaintiff cursorily references portions of Estep's deposition in which he acknowledges past criminal conduct and misrepresentations regarding his educational background in a bid on behalf of Wired Fox to the Alaska Rural Airport Authority, all entirely unrelated to the Intellisoft dispute. (*See id.* n.10.) To say nothing of the utter lack of explanation of how the referenced testimony bears any relation to the breach of contract claim, the Court finds that these references do not represent material issues of fact and are insufficient to preclude the entry of summary judgment.

With respect to the second allegation, that Estep formed Steel Lions to lure away Wired Fox's existing customers, Plaintiff has not produced any evidence to support this claim. Neither has Plaintiff explained how this would be a breach of any contract between Estep and Wired Fox, which plainly terminated once the proposed Wired Fox venture had been abandoned and Estep, Mosley, and Weatherill had all left, unencumbered by non-compete obligations. Accordingly, the Court finds that no genuine issue of material fact remains, and that Defendants are entitled to summary judgment on the breach of contract claim.

### E. Unjust Enrichment

In Count VI of the amended complaint, Plaintiff requests that the Court "award to it damages incurred by it that were directly and proximately caused by Defendant Estep's copyrighting of the Blue Fox Code . . . ." (ECF No. 71 ¶ 87.) Thus, this unjust enrichment claim appears at the outset to be entirely predicated on Estep's alleged misappropriation of the Blue Fox Code, and would be preempted by the Copyright Act along with the rest of the claims that were not permitted in the amended complaint. Nonetheless, because

29

the Court failed to address the unjust enrichment claim in its September 21, 2015 order, it will do so now.

The substantive allegations of Plaintiff's unjust enrichment claim are as follows: (1) Wired Fox invested extensive time and money in marketing and promoting the collaborative vision developed throughout Estep's work pursuant to the Independent Contractor Agreement; (2) Wired Fox reimbursed Estep for all expenses he incurred while creating the Blue Fox Code and compensated him with 50% of all software maintenance revenues; (3) Estep has been unjustly enriched by utilizing Wired Fox's resources and access to Wired Fox's assets in creating the Blue Fox Code, now subject to a copyright that he owns; (4) if Estep is allowed to keep "other misappropriated proprietary materials" belonging to Wired Fox and to control Wired Fox owned resources, he will be unjustly enriched; and (5) Estep's access to and use of Wired Fox's "proprietary information" relating to the bid proposal to Alaska Rural Airport Authority further enhanced Defendants unjust gains and their ability to unfairly compete in the software market with Wired Fox. (*See id.* ¶¶ 84-86.)

"The elements to recover for unjust enrichment based on quantum meruit, quasi-contract, or implied by law contract, which are equivalent terms for equitable relief, are: '(1) a benefit conferred by the plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value.'" *Regions Bank v. Wingard Properties, Inc.*, 715 S.E.2d 348, 356 (S.C. Ct. App. 2011) (quoting *Myrtle Beach Hosp., Inc. v. City of Myrtle Beach*, 532 S.E.2d 868, 872 (S.C. 2000).

30

Plaintiff urges the Court to sustain the unjust enrichment claim by arguing that this cause of action "finds support . . . through material beyond copyright protection" and that "issues regarding ownership [of the copyright] do not form the basis of the claim." (ECF No. 135 at 17.) But, to the extent such "material beyond copyright protection" is comprised of Wired Fox's investments of time and money, Wired Fox's provision of hardware, administrative, and marketing resources, Wired Fox's payment of Estep for work performed, Yelton's payment of a portion of Estep's legal fees in the Intellisoft dispute, and the like, these actions were simply the fulfillment of promises made by Yelton and Wired Fox to Estep and elements of their various, and constantly evolving, agreements. Estep's enrichment by way of these occurrences only becomes putatively unfair, once one takes into account Plaintiff's follow-on averment that Estep, *and not Wired Fox*, ended up owning the copyright—at which point the unjust enrichment claim devolves into a copyright misappropriation claim once again and preemption is invoked. As to the alleged misappropriation of other "proprietary materials" and "proprietary information" (*see* ECF No. 71 ¶¶ 85-86), Plaintiff has not produced evidence to support such claims and has not explained their substance.

Ironically, Plaintiff purports to rely on *Pan-American Products & Holdings, LLC v. R.T.G. Furniture Corp.*, 825 F. Supp. 2d 664 (M.D.N.C. 2011), as support for Plaintiff's assertion that the unjust enrichment claim here is qualitatively different than a copyright infringement claim. In that case, the Middle District of North Carolina actually held that there was no qualitative difference between the plaintiff's unjust enrichment claim and a copyright infringement claim. *Id.* at 695. Accordingly, the court dismissed the plaintiff's

unjust enrichment claim as preempted by the Copyright Act. *Id.* at 696. Plaintiff has not pointed the Court to any authority that is persuasive to show that by acting in accordance with their agreements with and promises to Estep, Yelton and Wired Fox have somehow conferred upon Plaintiff an independent basis to bring the unjust enrichment claim, which is otherwise clearly premised on Estep's alleged misappropriation of the Blue Fox Code copyright.

Suffice to say, an unjust enrichment claim does not germinate every time a proposed business venture goes awry and one party to the deal loses more of its investment than the other. When the proposed Wired Fox venture failed, Plaintiff did not get the ownership interest in the Blue Fox Code (of which Estep was the sole author) that it expected and desired, and Estep did not get the corporate ownership interest and ongoing source of financing and compensation that he expected and desired. The fact that Wired Fox expended significant capital during the protracted period of partial verbal agreements, informal revisions, and continuous negotiations, interspersed with various parties' unilateral actions, does not lead to the conclusion that Estep was unjustly enriched by those capital expenditures. Wired Fox could have made Estep a bona fide employee and ensured its ownership over any resultant software copyrights before it expended any capital, but it did not; it could have obtained a signed writing indicating that the Blue Fox Code was a "work made for hire" and solidified its ability to sue for misappropriation of any resultant copyright, but it did not. In the context of the factual circumstances surrounding the constant evolution of the parties' agreements and the collective failure to consummate the venture as envisioned and re-envisioned, the unjust

enrichment claim comes off as a last ditch effort at leveling the playing field ex-post, based on the notion that Estep ended up with more than Wired Fox and that such a result is inequitable. The Court will not impose random standards of fairness upon the fallout of the parties' failed negotiations through the amorphous equitable doctrine of unjust enrichment. Plaintiff has not demonstrated that any genuine issue of material fact remains. Accordingly, the Court grants summary judgment on the unjust enrichment claim.

## II. Estep's Motion for Partial Summary Judgment on His Counterclaims

### A. Declaratory Judgment—Copyright

The Declaratory Judgment Act, 28 U.S.C. § 2201, states:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (emphasis added). The Declaratory Judgment Act's "actual controversy" requirement is synonymous with Article III's case or controversy requirement; it "require[s] that the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial

controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941) (citing *Aetna*, 300 U.S. at 239-42). The Fourth Circuit has stated that "[a]lthough declaratory judgments are frequently sought in advance of the full harm expected, they must still present a justiciable controversy rather than abstract, hypothetical or contingent questions." *Miller v. Augusta Mut. Ins. Co.*, 157 Fed. App'x 632, 637 (4th Cir. 2005) (quoting *St. Thomas-St. John Hotel & Tourism Ass'n v. United States Virgin Islands*, 218 F.3d 232, 240 (3d Cir. 2000) (internal quotation marks omitted).

Estep seeks summary judgment on his counterclaim for declaratory judgment under the Copyright Act. The counterclaim seeks a judgment of the Court declaring the rights and responsibilities of the parties with respect to the copyright pertaining to the Blue Fox Code, including the following findings of fact and conclusions of law:

> a. that Defendant Estep is the lawful and correct owner of all copyrights on software for which he was the author or programmer, including the Blue Fox Code;
>
> b. that Defendant Estep did not create the software in question as a "work made for hire" as defined by section 101(1) of the Copyright Act, because he was not an "employee" of Plaintiff or any business venture with the Counterclaim Defendants, under common-law doctrines of master-servant or principal-agent, at the time such software was created;
>
> c. that Defendant Estep agreed to transfer a 50% ownership interest in the copyright to the software in question to Plaintiff or a business venture with the Counterclaim Defendants, only as part of the agreement whereby he would receive certain benefits, including a 50% ownership interest in Wired Fox Technologies, Inc., salary and benefits as a W-2 employee of the company, and reimbursement in full of all legal fees incurred in defending against the Intellisoft lawsuit; however, Plaintiff and the Counterclaim Defendants never upheld their obligations under the agreement; and

      d. that Defendant Estep merely granted to Plaintiff a limited license to allow two of Plaintiff's customers or clients (Brashier Middle College and Greenville Technical College) to use such software or source code.

(ECF No. 81 ¶ 173.)

      Estep asserts that he is entitled to summary judgment on this counterclaim because there is no genuine issue of material fact as to any of the proposed findings. (*See* ECF No. 127-1 at 32-34.) Counterclaim Defendants respond that the Court lacks subject matter jurisdiction over the claim because there is no "actual controversy" as to Estep's ownership of the copyright to the Blue Fox Code, and Estep has not adequately demonstrated a reasonable apprehension of litigation related to ownership of the copyright, Counterclaim Defendants' attempted divestment of Estep's interest therein, or Counterclaim Defendants' potential infringement thereof. (*See* ECF No. 135 at 4-11.) Estep replies that Wired Fox's original complaint was premised on repeated allegations that it owned the Blue Fox Code exclusively, that Counterclaim Defendants have never filed any document expressly stating they will not attempt to divest Estep of his interest in the copyright (despite their eleventh-hour offer to do so in the response brief, *see id.* at 9), and that he has been unable to utilize or market the Blue Fox Code for more than a year and a half due to the pendency of this lawsuit and a UCC-1 filing the Counterclaim Defendants made immediately prior to the filing of the lawsuit claiming a security interest in the software and making it impossible to sell. (*See* ECF No. 136 at 3-7; 127-3 ¶ 56)

      The Court is wholly unconvinced by Counterclaim Defendants arguments regarding a putative lack of subject matter jurisdiction, and finds that there is a ripe cause of action for declaratory judgment in this instance. One need look no further than

paragraph 14 of the amended complaint to dispel with the notion that Estep's concerns about litigation surrounding his ownership and use of the Blue Fox Code are real: "Pursuant to the Agreement[6], the Blue Fox Code was to be **owned and used exclusively by [Wired Fox]** in order to provide customizable products and services to third parties, including security and identification software, program development enhancement, scanners, identification car supplies, and various other uses." (ECF No. 71 ¶ 14 (emphasis added).) Moreover, this claim is repeated in Yelton's most recent declaration, which is attached as evidentiary support to Counterclaim Defendants' response to the motion for partial summary judgment: "According to the Agreement, the Blue Fox Code was to be **owned and used exclusively by [Wired Fox]**." (ECF No. 135-1 ¶ 6.) Counterclaimant puts it best in his reply brief: "Plaintiff[-Counterclaim Defendant] cannot seriously be heard to argue that [] Estep has no reasonable apprehension of litigation about the Blue Fox Code." (ECF No. 136 at 4.)

It is undisputed that Estep was the sole author of the Blue Fox Code. The Copyright Act of 1976 provides that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). The exclusive rights to control reproduction, distribution, and performance or display of original copyrighted material, as well as the production of derivative works "presumptively vest in the author—the one who translates an original idea into a fixed, tangible means of expression." *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994) (considering such rights with respect to computer source code specifically) (citing 17 U.S.C. §§ 102(a), 106). "The presumption of authorial

---

[6] Plaintiff uses the term "the Agreement" throughout all of its filings to refer to the proposed Independent Contractor Agreement that Yelton emailed to Estep on December 9, 2103 during their early discussions about the business relationship between Estep and Wired Fox. (ECF No. 127-3 at 20-24.)

ownership falls, however, if the work is made 'for hire,' such as one 'prepared by an employee within the scope of his or her employment.'" *Id.* (quoting *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 737-38 (1989) (quoting 17 U.S.C. §§ 101(1), 201(b))). In *Community for Creative Non-Violence*, the U.S. Supreme Court recognized that the "work for hire" doctrine in 17 U.S.C. §101(1) applies only to employees, not to independent contractors. 490 U.S. at 752-53. Moreover, the Court held that where a work is specifically ordered or commissioned of an independent contractor, it will only be considered a "work made for hire" if it satisfies the terms of 17 U.S.C. § 101(2). *Id.* at 753. Section 101(2) requires, *inter alia*, that the parties "expressly agree *in a written instrument signed by them* that the [commissioned] work shall be considered a work made for hire." 17 U.S.C. § 101(2) (emphasis added).

Simply put, there is no written instrument signed by Estep and Yelton/Wired Fox expressly agreeing that any software created by Estep during his work as an independent contractor would be considered a "work made for hire." Accordingly, the Court finds that there was never any transfer of Estep's copyright ownership in the Blue Fox Code, which presumptively vested in him as the source code's author.

Throughout the course of this litigation, Plaintiff-Counterclaim Defendant Wired Fox has continuously represented that the proposed Independent Contractor Agreement was, at all relevant times, an enforceable agreement between the parties. (*See, e.g.*, Yelton Decl. ¶¶ 5-6, ECF No. 135-1 at 3-4.) But, the Court's requirement to view all facts and construe all inferences in a light most favorable to Counterclaim Defendants does not mean that the Court must temporarily trick itself, during the summary judgment

37

phase, into believing that the Independent Contractor Agreement was an executed document, when it plainly was not. Other than repeatedly and mechanically asserting that this document was the operative "Agreement" between Estep and Wired Fox, Counterclaim Defendants have not offered any evidence to contravene Estep's contention that his initial promise to share ownership of the code was linked to and premised upon his being granted a 50% ownership interest in the company. In other words, Counterclaim Defendants have not offered evidence to show that Estep's promise to share joint/equal ownership of Blue Fox would persist *independent* of his expectation, based on Yelton's promises, of joint/equal ownership in the security software corporation that they envisioned together. The terms of Estep's ownership in the corporation were changing over time as Yelton substituted Mosley and Weatherill for his place in Wired Fox, and as Mosley and Weatherill demanded a majority share of the corporation, so it is little wonder that Estep's offer to share rights to the Blue Fox Code changed as well.

The Court finds that no genuine issue of material fact remains with respect to Estep's counterclaim for declaratory judgment. Accordingly, the Court grants summary judgment on this counterclaim with minor modifications to the proposed findings. Namely, proposed finding "c." is hereby modified to read:

> c. that Defendant Estep agreed to transfer a 50% ownership interest in the copyright to the software in question to Plaintiff or a business venture with the Counterclaim Defendants, only as part of the agreement whereby he would receive certain benefits, including but not limited to a 50% ownership interest in Wired Fox Technologies, Inc.; however, Plaintiff and the Counterclaim Defendants never upheld this obligation under the agreement; and

The Court makes these modifications in order to eliminate unnecessary and immaterial

differences between Estep and Yelton's declarations with respect to when certain fringe benefits became part of the bargain, what portion of Estep's legal fees were to be reimbursed, and the like. One thing is completely clear, Counterclaim Defendants have not offered evidence sufficient to create an issue of material fact regarding Estep's consistent assertion that his promise to share rights to the Blue Fox Code was contingent upon Counterclaim Defendants' fulfillment of their part of the bargain by granting him the ownership share in Wired Fox that both he and Yelton contemplated during their discussions about the venture. Incessant references to the unsigned Independent Contractor Agreement, which by its own terms expired on July 1, 2014, do not actually directly rebut Estep's assertions about the agreement as he understood it, and in any event are not enough to preclude the entry of summary judgment.

### B. South Carolina Payment of Wages Act

Section 41-10-40(A) of the South Carolina Payment of Wages Act requires employers to pay all wages due. S.C. Code § 41-10-40(A). The term "employer" as defined by the Act includes "every person, firm, partnership, association, corporation, receiver, or other officer of a court of this State, the State or any political subdivision thereof, and any agent or officer of the above classes employing any person in this State." S.C. Code § 41-10-10(1). The Payment of Wages Act is a remedial statute that is designed to protect employees and assist them in collecting compensation wrongfully withheld. *Dumas v. Info Safe Corp.*, 463 S.E.2d 641, 645 (S.C. Ct. App. 1995). The statute was "intended to impose individual liability on agents and officers of a corporation who knowingly permit their corporation to violate the Act." *Id.*

Estep's counterclaim for unpaid wages is based on the undisputed fact that he never received any salary payments from Wired Fox, although he was employed by Wired Fox through the second week of December 2014, when Mosley, Weatherill, and AEI withdrew from the Wired Fox venture. (ECF No. 127-1 at 34.) Estep asserts that Yelton's July 31, 2014 email acknowledged a duty on the part of Wired Fox to pay Estep's salary and benefits. (*See id.*; ECF No. 127-3 at 26.) Accordingly, Estep argues, he is owed the salary he would have received between July 31, 2014 and December 12, 2014 (*see* ECF No. 128-2 at 4, reflecting Mosley's effective resignation date as President of Wired Fox). At the very least, Estep avers, he is owed the salary he would have received from September 10, 2014 onward, because Mosley signed an employment letter as President of Wired Fox that states: "Effective September 10, 2013, Chris Estep became an employee of Wired Fox Technologies. His compensation rate is $96K annually." (ECF No. 127-8 at 3.) Estep argues that no material issue of fact remains and that summary judgment should be granted on this counterclaim.

Counterclaim Defendants do not dispute that they fall within the definition of "employer" under the Payment of Wages Act, but they maintain that Estep was not an "employee" under the Act and therefore is not owed any wages. (ECF No. 135 at 11.) In a series of obfuscating arguments and citations to case law related to the Payment of Wages Act, Counterclaim Defendants assert that Estep's role as an independent contractor persisted through the demise of the venture and that the $8,000 monthly amount Estep is claiming should not be considered "wages" under the Act because Estep characterized that amount as a "draw." (*Id.* at 11-12.)

The case law cited by Counterclaim Defendants is entirely inapposite. A straightforward review of the evidence reveals that the only material dispute remaining on this claim is *when* Estep transitioned from an independent contractor to an employee. The parties dispute the import of Yelton's July 31, 2014 email as it pertains to this transition, and the dispute is genuine. However, Counterclaim Defendants' assertion that Estep remained an independent contractor, even after receiving a letter signed by the President of Wired Fox and delineating the effective date of his employee status and salary, is untenable. Accordingly, the Court grants summary judgment on this counterclaim and finds that Estep is entitled to receive his pro rata wages from September 10, 2014 to December 12, 2014.

## CONCLUSION

For the foregoing reasons, Plaintiff's tortious interference with contractual relations claim (Count III) and conspiracy claim (Count I) are dismissed with prejudice. Defendants Estep and Steel Lions' motion for summary judgment on Wired Fox's claims (ECF No. 127) is GRANTED, and Estep's motion for partial summary judgment on his counterclaims (ECF No. 127) is GRANTED.

**IT IS SO ORDERED.**

/s/Bruce Howe Hendricks
United States District Judge

March 27, 2017
Greenville, South Carolina

41